## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| HUGUES GERVAT, derivatively on behalf of CITRIX SYSTEMS, INC., | Case No.: |
| Plaintiff, | |
| v. | |
| DAVID J. HENSHALL, ROBERT M. CALDERONI, ARLEN SHENKMAN, PAUL J. HOUGH, MARK J. SCHMITZ, NANCI E. CALDWELL, JESSE A. COHN, ROBERT D. DALEO, MURRAY J. DEMO, AJEI S. GOPAL, ROBERT E. KNOWLING, JR., THOMAS E. HOGAN, MOIRA A. KILCOYNE, PETER J. SACRIPANTI, and J. DONALD SHERMAN, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| CITRIX SYSTEMS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Hugues Gervat ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Citrix Systems, Inc. ("Citrix" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants David J. Henshall, Robert M. Calderoni, Arlen Shenkman, Paul J. Hough, Mark J. Schmitz, Nanci E. Caldwell, Jesse A. Cohn, Robert D. Daleo, Murray J. Demo, Ajei S. Gopal, Robert E. Knowling, Jr., Thomas E. Hogan, Moira A. Kilcoyne, Peter J. Sacripanti, and J. Donald Sherman (collectively, the "Individual Defendants" and with Citrix, "Defendants") for breaches of their fiduciary duties as directors

1

and/or officers of Citrix, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Citrix, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Citrix's directors and officers from January 22, 2020 through October 6, 2021, both dates inclusive (the "Relevant Period").

2.      Citrix is an enterprise software company that has been a leader in providing remote access solutions since its incorporation in Delaware in 1989. Currently headquartered in Fort Lauderdale, Florida, the Company's flagship product is Citrix Workspace, an application that provides users a single, integrated platform in which to access proprietary and widely used files and programs.

3.      For most of its history, the Company has offered its products "on-premises," meaning the Company's software was installed onto customers' devices. Additionally, the Company's traditional business model has involved "perpetual" licenses that require an upfront

payment, as opposed to subscription licenses in which customers pay a recurring fee. In the 2010s, the Company increasingly sought to move from on-premises to cloud-based solutions and from perpetual licenses to a subscription-based model. Software that is cloud-based and available via subscription is often referred to as "Software-as-a-Service," or "SaaS." In 2017, the Company announced an affirmative intent to transition to a subscription-based business model.

4.      During the first quarter of 2020, and as a result of the coronavirus pandemic, the Company experienced increased demand for solutions to address business continuity needs. The heightened demand resulted in increased sales, at least in part due to the Company's decision to offer limited use short-duration, discounted, on-premise licenses ("Short-Term Continuity Licenses") of Citrix Workspace. The Company expected that customers would transition to longer-term and subscription-based services following the expiration of the Short-Term Continuity Licenses.

5.      Beginning January 22, 2020 and throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning Citrix's business, operations, and prospects. Specifically, during the Relevant Period, the Individual Defendants and the Company repeatedly touted the success of the Company's transition to a subscription-based, cloud-based service.

6.      However, during this time, the Individual Defendants failed to disclose that the Company was experiencing difficulties transitioning customers from the Short-Term Continuity Licenses to longer subscription-based and cloud-based contracts.

7.      The Individual Defendant's misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period, during which time seven of the Individual Defendants benefitted from lucrative insider sales at artificially

inflated prices for proceeds of approximately $22.52 million.

8.      The truth emerged in 2021, when the Company disclosed that the transition was not going as planned. First, on April 29, 2021, the Company disclosed that customers were not converting their Short-Term Continuity Licenses into longer contracts. As a result, the price per share of the Company's stock declined $10.49, or 7.6%, to close April 29, 2021 at $128.02 per share.

9.      Then, on July 29, 2021, the Company announced, *inter alia*, a major restructuring of the Company's sales team, noting that the implemented changes "are significant and may cause short-term disruption before yielding tangible results." As a result, the price per share of the Company's stock declined $15.55, or approximately 13.6%, to close July 29, 2021 at $99.00 per share.

10.     On October 6, 2021, after the close of markets, the Company announced that Defendant David J. Henshall ("Henshall") was stepping down as President and CEO. As a result, the Company's stock declined $7.64, or approximately 7.2%, over the next two days, to close October 8, 2021 at $98.32.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's transition to a cloud-based and subscription-based business model. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was struggling to transition customers to a subscription-based model and from on-premises offerings to cloud-based offerings; and (2) the Company failed to maintain adequate internal controls. As a result of the foregoing, Citrix's public

4

statements were materially false and misleading at all relevant times.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while seven of the Individual Defendants sold Company shares at inflated prices for proceeds of approximately $22.5 million.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

14.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Over eleven million shares of the Company's common stock were repurchased between January 2020 and September 2021 for approximately $1.51 billion. As the Company's stock was actually only worth $98.32 per share during that time, the price at closing on October 8, 2021, the Company overpaid by approximately $378.44 million in total.

15.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), its Chairman who is serving as interim CEO, its Chief Financial Officer ("CFO"), its former Chief Product Officer ("CPO"), and its Chief Operating Officer ("COO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Florida (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the

Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Chairman's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. Furthermore, the Company's principal executive offices are located in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Citrix. Plaintiff has continuously held Citrix common stock at all relevant times.

### Nominal Defendant Citrix

23.     Citrix is a Delaware corporation with its principal executive offices 851 West Cypress Creek Road, Fort Lauderdale, FL 33309. Citrix's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "CTXS."

### Defendant Henshall

24.     Defendant Henshall served as the Company's President and CEO and as a member of the Board from July 2017 until October 6, 2021. According to the Company's Schedule 14A filed with the SEC on April 16, 2021 (the "2021 Proxy Statement"), as of February 28, 2021, Defendant Henshall beneficially owned 274,341 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Henshall owned approximately $36.6 million worth of Citrix stock.

25.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Henshall received $22,596,498 in compensation from the Company, including $1,000,000 in salary, $18,685,309 in stock awards, $2,417,400 in non-equity incentive plan compensation, and $493,789 in all other compensation.

26.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Henshall made the following sales of Company common stock at artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 2/3/2020 | 4,773 | $121.09 | $577,962 |
| 3/2/2020 | 4,293 | $104.06 | $446,729 |
| 3/30/2020 | 5,730 | $141.30 | $809,649 |
| 5/1/2020 | 5,729 | $143.62 | $822,798 |
| 6/1/2020 | 5,981 | $147.39 | $881,539 |
| 7/1/2020 | 6,004 | $147.01 | $882,648 |
| 8/3/2020 | 6,420 | $142.91 | $917,482 |
| 9/1/2020 | 4,220 | $145.04 | $612,068 |
| 10/1/2020 | 5,826 | $139.21 | $811,037 |
| 11/2/2020 | 8,000 | $113.62 | $908,960 |
| 1/4/2021 | 8,000 | $130.75 | $1,046,000 |
| 2/1/2021 | 2,000 | $133.47 | $266,940 |
| 3/1/2021 | 2,000 | $134.77 | $269,540 |
| 4/1/2021 | 2,000 | $140.07 | $280,140 |
| 5/3/2021 | 5,860 | $123.26 | $722,303 |
| 6/1/2021 | 5,860 | $115.16 | $674,837 |
| 8/2/2021 | 6,155 | $100.28 | $617,223 |
| 9/1/2021 | 6,154 | $103.22 | $635,215 |
| 10/1/2021 | 5,450 | $107.96 | $588,382 |

Thus, before the scheme was exposed, Defendant Henshall sold 100,455 shares of Company common stock at artificially inflated prices for proceeds of approximately $12.78 million. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.     The 2021 Proxy Statement stated the following about Defendant Henshall:

Mr. Henshall has served as our President and Chief Executive Officer and as a member of our Board of Directors since July 2017. Mr. Henshall served as our Executive Vice President and Chief Financial Officer from September 2011 until July 2017 and as our Chief Operating Officer from February 2014 until July 2017. Mr. Henshall was appointed Acting Chief Executive Officer and President from October 2013 to February 2014. From January 2006 to September 2011, Mr. Henshall served as our Senior Vice President and Chief Financial Officer, and from April 2003 to January 2006, he served as our Vice President and Chief Financial Officer.

**Defendant Calderoni**

28.     Defendant Robert M. Calderoni ("Calderoni") is currently Chairman of the Board and Interim President and CEO. He has served on the Board since June 2014 and was the Board's Executive Chairman from July 2015 through December 2018. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Calderoni beneficially owned 30,718 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Calderoni owned approximately $4.1 million worth of Citrix stock.

29.     For the 2020 Fiscal Year, Defendant Calderoni received $472,143 in compensation from the Company, including $170,000 in fees earned or paid in cash, $261,266 in stock awards, and $40,877 in all other compensation.

30.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Calderoni made the following sale of Company common stock at artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 5/5/2020 | 29,591 | $147.48 | $4,364,169 |

His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and

participating in the scheme.

31.     The 2021 Proxy Statement stated the following about Defendant Calderoni:

Mr. Calderoni served as Chairman and Chief Executive Officer of Ariba, Inc., a cloud applications and business network company, from October 2001 until it was acquired by SAP, a publicly-traded software and IT services company, in October 2012, and then continued as Chief Executive Officer of Ariba following the acquisition until January 2014. Mr. Calderoni also served as a member of the global managing board at SAP AG between November 2012 and January 2014 and as President SAP Cloud at SAP AG from June 2013 to January 2014. Mr. Calderoni has also held senior finance roles at Apple and IBM and served as Chief Financial Officer of Avery Dennison Corporation. From October 2015 to January 2016, Mr. Calderoni served as the Interim Chief Executive Officer and President of Citrix. Mr. Calderoni served as Executive Chairman of Citrix from July 2015 through December 2018. Mr. Calderoni currently serves as Chairman of the Board of Citrix. Mr. Calderoni previously served on the Boards of Directors of Juniper Networks, Inc., a publicly-traded networking company from 2003 to 2019, and LogMeIn, Inc., a then publicly-traded remote access and remote software company, from 2017 to 2020.

The Board believes Mr. Calderoni's qualifications to sit on our Board of Directors include his extensive leadership and business development experience as the leader of a publicly-traded Software-as-a-Service company and his deep financial, accounting, corporate finance and operations expertise, including business transition situations, gleaned through his experience in managing large-scale global enterprises.

**Defendant Shenkman**

32.     Defendant Arlen Shenkman ("Shenkman") has served as the Company's Executive Vice President and CFO since September 2019. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Shenkman beneficially owned 12,935 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Shenkman owned approximately $1.7 million worth of Citrix stock.

33.     For the 2020 Fiscal Year, Defendant Shenkman received $7,863,157 from the Company, including $575,000 in salary, $500,000 in bonus, $5,590,607 in stock awards, $926,670

in non-equity incentive plan compensation, and $270,880 in all other compensation.

34.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Shenkman made the following sales of Company common stock at artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 10/2/2020 | 673 | $137.42 | 92,483 |
| 11/2/2020 | 673 | $113.62 | 76,466 |
| 12/1/2020 | 673 | $124.31 | 83,660 |
| 1/4/2021 | 673 | $130.75 | 87,994 |
| 2/1/2021 | 673 | $133.47 | 89,825 |
| 3/3/2021 | 673 | $134.77 | 90,700 |
| 4/5/2021 | 673 | $138.55 | 93,244 |
| 5/3/2021 | 935 | $123.26 | 115,248 |
| 6/1/2021 | 935 | $115.16 | 107,674 |
| 8/2/2021 | 935 | $100.28 | 93,761 |
| 9/1/2021 | 935 | $103.22 | 96,510 |

Thus, before the scheme was exposed, Defendant Shenkman sold 8,451 shares of Company common stock at artificially inflated prices for proceeds of $1,027,565. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35.     The 2021 Proxy Statement stated the following about Defendant Shenkman:

Mr. Shenkman has served as our Executive Vice President and Chief Financial Officer since September 2019. Prior to joining Citrix, Mr. Shenkman served as Executive Vice President and Global Head of Business Development and Ecosystems of SAP from May 2017 to August 2019, where he was responsible for driving business development by building new ecosystems, fostering strategic partnerships, incubating new business models, and overseeing investments and mergers and acquisitions. Prior to that role from January 2015 to May 2017, Mr. Shenkman served as Chief Financial Officer of SAP North America, SAP's largest business unit, responsible for all finance functions in North America, including forecasting and planning, identifying efficiencies, and ensuring the region's overall

financial health. Mr. Shenkman previously served as SAP's Global Head of Corporate Development from January 2012 to January 2015 and was a principal architect of SAP's rapid transformation into a cloud company.

**Defendant Hough**

36.     Defendant Paul J. "PJ" Hough ("Hough") served as the Company's Executive Vice President and CPO from October 2016 until November 2021, when he transitioned to serving as an advisor to the CEO. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Hough beneficially owned 70,337 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Hough owned approximately $9.4 million worth of Citrix stock.

37.     For the 2020 Fiscal Year, Defendant Hough received $8,799,399 in compensation from the Company, including $509,750 in salary, $7,297,497 in stock awards, $739,388 in non-equity incentive plan compensation, and $252,764 in all other compensation.

38.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hough made the following sales of Company common stock at artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 6/10/2020 | 2,000 | $141.92 | $283,840 |
| 9/8/2020 | 2,000 | $133.89 | $267,780 |
| 12/8/2020 | 2,000 | $129.76 | $259,519 |
| 3/8/2021 | 2,000 | $135.00 | $270,000 |

Thus, before the scheme was exposed, Defendant Hough sold 8,000 shares of Company common stock at artificially inflated prices for proceeds of $1,081,139. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions

were exposed, demonstrate his motive in facilitating and participating in the scheme

39.     The 2021 Proxy Statement stated the following about Defendant Hough:

Mr. Hough has served as our Executive Vice President and Chief Product Officer since October 2016. Prior to joining Citrix, Mr. Hough served as Corporate Vice President, Developer Division at Microsoft from September 2012 to August 2015. Prior to that, Mr. Hough served in a variety of roles in the Microsoft Office Division driving vision and execution for the program management of Office suite culminating with the introduction of Office365. Mr. Hough holds 11 patents.

**Defendant Schmitz**

40.     Defendant Mark J. Schmitz ("Schmitz") has served as the Company's Executive Vice President and COO since July 2019. He previously served as the Company's Senior Vice President of Business Operations from 2016 to July 2019.

41.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Schmitz made the following sales of Company common stock at artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 1/28/2020 | 6,667 | $126.55 | $843,708 |
| 2/3/2020 | 1,119 | $121.09 | $135,499 |
| 3/30/2020 | 732 | $141.30 | $103,431 |
| 3/31/2020 | 1,401 | $144.08 | $201,856 |
| 4/1/2020 | 1,551 | $137.86 | $213,820 |
| 10/2/2020 | 1,605 | $137.42 | $220,559 |
| 1/28/2021 | 5,518 | $141.50 | $780,797 |
| 2/2/2021 | 1,358 | $132.63 | $180,111 |
| 3/30/2021 | 1,110 | $137.05 | $152,125 |

Thus, before the scheme was exposed, Defendant Schmitz sold 21,061 shares of Company common stock at artificially inflated prices for proceeds of $2.83 million. His insider sales, made with knowledge of material nonpublic information before the material misstatements and

omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

42.    The 2021 Proxy Statement stated the following about Defendant Schmitz:

Mr. Schmitz has served as our Executive Vice President and Chief Operating Officer since July 2019. Mr. Schmitz served as our Senior Vice President of Business Operations from September 2016 to July 2019. Prior to joining Citrix, from January 2015 to September 2016, Mr. Schmitz served as Chief Operating Officer for SAP SucessFactors, and from January 2014 to January 2015, Mr. Schmitz served as Chief Operating Officer, SAP Cloud, where he led business operations and was responsible for the deployment of SAP's cloud vision. From October 2012 to December 2013, Mr. Schmitz served as Senior Vice President and Chief Operating Officer, SAP Ariba.

**Defendant Caldwell**

43.    Defendant Nanci E. Caldwell ("Caldwell") has served as a Company director since July 2008. She is currently Lead Independent Director, Chair of the Nominating and Corporate Governance Committee, and a member of the Compensation Committee. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Caldwell beneficially owned 426 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Caldwell owned approximately $56,905 worth of Citrix stock.

44.    For the 2020 Fiscal Year, Defendant Caldwell received $477,475 in compensation from the Company, including $150,000 in fees earned or paid in cash, $261,266 in stock awards, and $66,209 in all other compensation.

45.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Caldwell made the following sales of Company common stock at artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|------|------------------|----------------------|----------|
| 2/6/2020 | 849 | $123.20 | $104,596 |

14

| 2/10/2020 | 214 | $120.94 | $25,881 |
| 3/4/2020 | 213 | $110.00 | $23,430 |
| 4/2/2020 | 214 | $137.86 | $29,502 |
| 5/4/2020 | 213 | $143.42 | $30,548 |
| 6/2/2020 | 213 | $145.90 | $31,076 |
| 7/2/2020 | 215 | $150.00 | $32,250 |

Thus, before the scheme was exposed, Defendant Caldwell sold 2,131 shares of Company common stock at artificially inflated prices for proceeds of $277,283. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

46.     The 2021 Proxy Statement stated the following about Defendant Caldwell:

Since 2005, Ms. Caldwell has served as a member of a number of boards of both public and private technology companies, including Donnelley Financial Solutions, Inc., a publicly-traded financial communications and data services company from 2016 to 2020; Talend SA, a publicly-traded data integration company from 2017 to 2020; Deltek, Inc., a publicly-traded enterprise management software company from 2005 to 2012; Network General, now NetScout Inc., a publicly-traded provider of integrated network performance management solutions from 2005 to 2007; and Hyperion Solutions Corporation, a publicly-traded provider of performance management software acquired by Oracle in 2007, from 2006 to 2007. From April 2001 until it was acquired by Oracle in December 2004, Ms. Caldwell served as Executive Vice President and Chief Marketing Officer for PeopleSoft, Inc., a publicly-traded human resources management software company. In addition, from June 2009 to December 2014, Ms. Caldwell served as a member of the board of Tibco Software Inc., a publicly-traded business integration and process management software company.

The Board believes Ms. Caldwell's qualifications to sit on our Board of Directors include her extensive experience with technology and software companies in the areas of sales and marketing, and her executive leadership and management expertise with publicly-traded companies

**Defendant Cohn**

47.     Defendant Jesse A. Cohn ("Cohn") served as a Company director from July 2015 until the Company's 2020 annual meeting of shareholders on June 3, 2020. He served during the Relevant Period as a member of the Nominating and Corporate Governance Committee.

48.     For the 2020 Fiscal Year, Defendant Cohn received $53,122 in compensation from the Company, consisting of $34,252 in fees earned or paid in cash, and $18,870 in all other compensation.

49.     The 2021 Proxy Statement stated the following about Defendant Cohn:

Mr. Cohn is a partner and head of U.S. equity activism at Elliott Management Corporation, a $32 billion investment firm. Mr. Cohn joined Elliott in 2004 and manages both public and private investments for the firm. Mr. Cohn also serves on the Board of Directors of several private companies. Mr. Cohn initially joined the Board in connection with our entry into a cooperation agreement with affiliates of Mr. Cohn's employer, Elliott Management.

**Defendant Daleo**

50.     Defendant Robert D. Daleo ("Daleo") served as a Company director from 2013 until the 2021 annual meeting of shareholders on June 4, 2021. He served during the Relevant Period as Chair of the Audit Committee and as a member of the Technology, Data and Information Security Committee. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Daleo beneficially owned 181 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Daleo owned approximately $24,177.98 worth of Citrix.

51.     For the 2020 Fiscal Year, Defendant Daleo received $456,709 in compensation from the Company, including $115,403 in fees earned or paid in cash, $261,266 in stock awards, and $80,040 in all other compensation.

52.     The Company's Schedule 14A filed with the SEC on April 16, 2020 (the "2020 Proxy Statement") stated the following about Defendant Daleo:

Prior to his retirement in December 2012, Mr. Daleo served as Vice Chairman of Thomson Reuters, a publicly-traded global provider of integrated information solutions to business and professional customers. Mr. Daleo previously served as

Executive Vice President and Chief Financial Officer of Thomson Reuters or its predecessors from 1998 through 2011, and was a member of The Thomson Corporation Board from 2001 to April 2008. Prior to joining The Thomson Corporation, he held various financial and operational leadership positions with The McGraw-Hill Companies, Inc., a publicly-traded content and analytics provider, and Automatic Data Processing, Inc., a publicly-traded provider of business outsourcing solutions.

The Board believes Mr. Daleo's qualifications to sit on our Board of Directors include his experience in managing a large-scale global enterprise, extensive financial accounting, corporate finance, operations and business development expertise through his experience as Chief Financial Officer of a large multinational company, as well as his prior board-level experience with Thomson Reuters and Equifax Inc.

**Defendant Demo**

53.     Defendant Murray J. Demo ("Demo") has served as a Company director since February 2005. He is currently Chair of the Audit Committee and a member of the Technology, Data and Information Security Committee. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Demo beneficially owned 11,336 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Demo owned approximately $1.51 million worth of Citrix stock.

54.     For the 2020 Fiscal Year, Defendant Demo received $364,798 in compensation from the Company, including $101,933 in fees earned or paid in cash, $261,266 in stock awards, $1,599 in all other compensation.

55.     The 2021 Proxy Statement stated the following about Defendant Demo:

From January 2018 to October 2020, Mr. Demo served as Executive Vice President and Chief Financial Officer of Rubrik, Inc., a privately-held cloud data management company. From October 2015 to January 2018, Mr. Demo served as Chief Financial Officer of Atlassian Corporation, a publicly-traded enterprise software company. Previously, Mr. Demo served as Executive Vice President and Chief Financial Officer of Dolby Laboratories, a publicly-traded global leader in entertainment technologies, from May 2009 until June 2012. Mr. Demo has also

17

served as Executive Vice President and Chief Financial Officer of LiveOps, a privately-held virtual call center company, and as Executive Vice President and Chief Financial Officer of Postini, Inc., a security software company, which was acquired by Google in September 2007. Mr. Demo also held various executive-level finance roles at Adobe Systems, including Executive Vice President and Chief Financial Officer. Mr. Demo previously served on the board of Xoom Corporation, a formerly publicly-traded global online money transfer provider that was acquired by PayPal in November 2015, from May 2012 to November 2015; and from December 2011 to December 2015, Mr. Demo served on the Board of Directors of Atlassian Corporation.

The Board believes Mr. Demo's qualifications to sit on our Board of Directors include his extensive experience with finance and accounting matters for global organizations in the technology industry, including the experience that he has gained in his roles as Chief Financial Officer of publicly-traded companies.

**Defendant Gopal**

56.     Defendant Ajei S. Gopal ("Gopal") served as a Company director from September 2017 until October 4, 2021. Throughout the Relevant Period until his resignation on October 4, 2021, he served as a member of the Technology, Data and Information Security Committee. He also served as a member of the Compensation Committee from the beginning of the Relevant Period until approximately June 2021, when he left the Compensation Committee and became a member of the Nominating and Corporate Governance Committee.

57.     For the 2020 Fiscal Year, Defendant Gopal received $401,244 in compensation from the Company, including $102,500 in fees earned or paid in cash, $261,266 in stock awards, and $37,478 in all other compensation.

58.     The 2020 Proxy Statement stated the following about Defendant Gopal:

Since January 2017, Dr. Gopal has served as President and Chief Executive Officer of ANSYS, Inc., a publicly-traded provider of engineering simulation software. Dr. Gopal served as President and Chief Operating Officer of ANSYS from August 2016 through December 2016. Prior to joining ANSYS, Dr. Gopal served as an Operating Partner at Silver Lake Partners, a technology investment equity firm, from April 2013 to August 2016, including a secondment to serve as Interim President and Chief Operating Officer of Symantec Corporation from April 2016 to August 2016. Dr. Gopal has also served as Senior Vice President at Hewlett-

Packard Company, a publicly-traded hardware, software and IT services company, from May 2011 to April 2013. Dr. Gopal has also served as Executive Vice President at CA Technologies, a publicly-traded business software company, from July 2006 to May 2011 and as Executive Vice President and Chief Technology Officer at Symantec Corporation, a publicly-traded cybersecurity software and services organization, from September 2004 to July 2006.

The Board believes Dr. Gopal's qualifications to sit on our Board of Directors include his experience in global operations, business growth strategies and investment discipline, as well as product development and innovation in large software and technology companies.

**Defendant Hogan**

59.     Defendant Thomas E. Hogan ("Hogan") has served as a Company director since December 2018. He currently serves as a member on the Audit Committee, Nominating and Corporate Governance Committee, and the Technology, Data and Information Security Committee. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Hogan beneficially owned 3,934 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Hogan owned approximately $525,503 worth of Citrix stock.

60.     For the 2020 Fiscal Year, Defendant Hogan received $376,130 in compensation from the Company, including $93,265 in fees earned or paid in cash, $261,266 in stock awards, and $21,599 in all other compensation.

61.     The 2021 Proxy Statement stated the following about Defendant Hogan:

Since January 2021, Mr. Hogan has served as Managing Director of Vista Equity Partners, a private equity company. From September 2019 through February 2020, Mr. Hogan served as President of North America and a member of the Executive Committee of Temenos AG, a publicly-traded banking solutions software company. Prior to the acquisition of Kony, Inc., in September 2019 by Temenos, Mr. Hogan served as Chief Executive Officer of Kony, Inc., a privately-held digital strategy company since 2014. He served as Chairman of the board of Kony, Inc. from 2017 through its acquisition in 2019. Prior to joining Kony, Mr. Hogan served

as Senior Vice President of Software at Hewlett Packard, a publicly-traded hardware, software and IT services company, from January 2006 to November 2009 and as Executive Vice President of Sales, Marketing, and Strategy from November 2009 to March 2011. Mr. Hogan has also served as President and Chief Executive Officer of Vignette, a publicly-traded enterprise content management company, from 2002 to 2006 and as Senior Vice President of Global Sales and Operations at Siebel Software, a publicly-traded customer relationship management application software company from January 1999 to January 2001. Mr. Hogan began his career at IBM in January 1982, where he held a variety of executive positions.

The Board believes Mr. Hogan's qualifications to sit on our Board of Directors include his decades of executive and operational experience with technology and software companies.

**Defendant Kilcoyne**

62.     Defendant Moira A. Kilcoyne ("Kilcoyne") has served as a Company director since June 2018. She serves as Chair of the Technology, Data and Information Security Committee. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Kilcoyne beneficially owned 4,908 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Kilcoyne owned approximately $655,610 worth of Citrix stock.

63.     For the 2020 Fiscal Year, Defendant Kilcoyne received $378,377 in compensation from the Company, including $115,512 in fees earned or paid in cash, $261,266 in stock awards, and $1,599 in all other compensation.

64.     The 2021 Proxy Statement stated the following about Defendant Kilcoyne:

Ms. Kilcoyne held various senior management roles at Morgan Stanley between 1989 and 2016, including most recently serving as Global Co-Chief Information Officer and Managing Director and Co-Head of Global Technology and Data from 2013 until 2016, and as the Chief Information Officer of Brokerage Venture, Wealth and Investment Management and as a Managing Director from 2010 until 2013. During 2007, Ms. Kilcoyne served as Managing Director and Head of Corporate Systems at Merrill Lynch before returning to Morgan Stanley. Ms.

20

Kilcoyne began her career at IBM, where she served in multiple technical roles before moving on to Morgan Stanley.

**Defendant Knowling**

65.    Defendant Robert E. Knowling, Jr. ("Knowling") has served as a Company director since October 2020. He serves as a member of the Compensation Committee.

66.    For the 2020 Fiscal Year, Defendant Knowling received $190,067 in compensation from the Company, including $16,721 in fees earned or paid in cash, $152,878 in stock awards, and $20,468 in all other compensation.

67.    The 2021 Proxy Statement stated the following about Defendant Knowling:

Mr. Knowling currently serves as the Chairman of Eagles Landing Partners, a private strategic management consulting company. Mr. Knowling also serves as an advisor-coach to chief executive officers. Mr. Knowling previously served as Chief Executive Officer of Telwares, a private provider of telecommunications expense management solutions, from 2005 to 2009. Mr. Knowling served as Chief Executive Officer of the New York City Leadership Academy, an independent nonprofit corporation created by Chancellor Joel I. Klein and Mayor Michael R. Bloomberg that is chartered with developing the next generation of principals in the New York City public school system from 2001 to 2005. Mr. Knowling served as Chairman and Chief Executive Officer of SimDesk Technologies, Inc. from 2001 to 2003. Prior to this, Mr. Knowling served as Chairman, President and Chief Executive Officer of Covad Communications, a Warburg Pincus private equity-backed start-up company.

The Board believes Mr. Knowling's qualifications to sit on our Board of Directors include his extensive experience in executive management and leadership roles, including service on other board of directors of a number of publicly-traded companies.

**Defendant Sacripanti**

68.    Defendant Peter J. Sacripanti ("Sacripanti") has served as a Company director since December 2015. He currently serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Sacripanti beneficially owned 10 shares of the Company's

common stock. Given that the price per share of the Company's common stock closed at $133.58

on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Sacripanti

owned approximately $13,358 worth of Citrix stock.

69. For the 2020 Fiscal Year, Defendant Sacripanti received $412,219 in compensation

from the Company, including $112,500 in fees earned or paid in cash, $261,266 in stock awards,

and $38,453 in all other compensation.

70. During the Relevant Period, when the Company materially misstated information

to the investing public to keep the stock price inflated, and before the scheme was exposed,

Defendant Sacripanti made the following sales of Company common stock at artificially inflated

price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 2/3/2020 | 214 | $121.09 | $25,913 |
| 3/2/2020 | 213 | $104.06 | $22,164 |
| 4/2/2020 | 214 | $137.86 | $29,502 |
| 5/4/2020 | 213 | $143.42 | $30,548 |
| 6/2/2020 | 213 | $145.90 | $31,076 |
| 7/2/2020 | 215 | $150.00 | $32,250 |

Thus, before the scheme was exposed, Defendant Sacripanti sold 1,282 shares of Company

common stock at artificially inflated prices for proceeds of $171,453. His insider sales, made with

knowledge of material nonpublic information before the material misstatements and omissions

were exposed, demonstrate his motive in facilitating and participating in the scheme.

71. The 2021 Proxy Statement stated the following about Defendant Sacripanti:

Since 1996, Mr. Sacripanti has served as a Partner at McDermott Will & Emery, an
international law firm with 2,000 full-time employees in North America, Europe
and Asia. In this position, he represents and defends major corporations and
industry groups, including Fortune 500 companies. From 2009 to 2016, Mr.
Sacripanti served as co-chairman of the firm's Executive Committee. Mr.
Sacripanti previously served on the Board of Directors of LogMeIn, Inc. a then
publicly-traded remote access and remote software company, from 2017 to 2020.

The Board believes Mr. Sacripanti's qualifications to sit on our Board of Directors include his management of an international business organization and his years of experience representing large corporations on a variety of legal matters.

**Defendant Sherman**

72.     Defendant J. Donald "JD" Sherman ("Sherman") has served as a Company director since March 2020. He currently serves as a member of the Audit Committee. According to the 2021 Proxy Statement, as of February 28, 2021, Defendant Sherman beneficially owned 662 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $133.58 on February 26, 2021, the last trading day before Sunday, February 28, 2021, Defendant Sherman owned approximately $88,430 worth of Citrix stock.

73.     For the 2020 Fiscal Year, Defendant Sherman received $447,042 in compensation from the Company, including $72,439 in fees earned or paid in cash, $353,377 in stock awards, and $21,226 in all other compensation.

74.     The 2021 Proxy Statement stated the following about Defendant Sherman:

Mr. Sherman has served as Chief Executive Officer of Dashlane, Inc., a provider of password management and security solutions since February 2021. From March 2012 to July 2020, Mr. Sherman served as President and Chief Operating Officer of HubSpot, Inc., a publicly-traded developer and marketer of software products for inbound marketing and sales. Prior to joining HubSpot, Mr. Sherman served as Chief Financial Officer of Akamai Technologies, a publicly-traded intelligent edge platform for securing and delivering digital experiences from 2005 to 2012. From 1990 to 2005, Mr. Sherman served in various positions at IBM including as Vice President of Financial Planning and Assistant Controller of Corporate Financial Strategy and Budgets. Mr. Sherman previously served on the board of Fiserv, Inc., a publicly-traded global provider of financial services technology from November 2015 to August 2019.

The Board believes Mr. Sherman's qualifications to sit on our Board of Directors include his extensive experience with finance and operational matters for global organizations in the technology industry, including the experience that he has gained in his roles as Chief Executive Officer, Chief Operating Officer and Chief Financial Officer of publicly-traded companies.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

23

75.     By reason of their positions as officers, directors, and/or fiduciaries of Citrix and because of their ability to control the business and corporate affairs of Citrix, the Individual Defendants owed Citrix and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Citrix in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Citrix and its shareholders so as to benefit all shareholders equally.

76.     Each director and officer of the Company owes to Citrix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

77.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Citrix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

78.     To discharge their duties, the officers and directors of Citrix were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

79.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Citrix, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were

aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Citrix's Board at all relevant times.

80.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

81.     To discharge their duties, the officers and directors of Citrix were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Citrix were required to, among other things:

          (a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to Citrix's own Code of Business Conduct (the "Code of Conduct");

          (b)     conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Citrix conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Citrix and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Citrix's operations would comply with all applicable laws and Citrix's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

82.     Each of the Individual Defendants further owed to Citrix and the shareholders the duty of loyalty requiring that each favor Citrix's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

83.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Citrix and were at all times acting within the course and scope of such agency.

84.     Because of their advisory, executive, managerial, directorial, and controlling positions with Citrix, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

85.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Citrix.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

86.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

87.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock

price.

88.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Citrix was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

89.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

90.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Citrix, and was at all times acting within the course and scope of such agency.

## CITRIX'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Citrix's Code of Conduct

91.     With regard to conflicts of interest, the Code of Conduct states, "Citrix encourages you to partake in legitimate financial, business, or other activities outside your job so long as they do not conflict with your responsibilities to Citrix . . . . Having a conflict is not necessarily a violation of the Code, but failing to disclose and seek approval is."

92.     With regarding to protecting company assets, the Code of Conduct provides as

follows:

**Protect Citrix assets and those of our customers and partners, particularly
confidential information**

Always use Citrix assets for legitimate business purposes. When you are entrusted
with these assets, you are responsible for making sure that adequate safeguards exist
to prevent their unauthorized use, loss or destruction.

Confidential information of Citrix is a valuable asset. You should use confidential
information only as authorized and only for Citrix business.

93.     Under the heading "Conduct business the right way," the Code of Conduct

provides as follows:

**Citrix business must always be conducted in an ethical, honest and
fair manner**

**Tell the truth.**
Never make oral or written misrepresentations, or dishonest or misleading
statements, to anyone. This applies to all areas of Citrix business and all of its
relationships, and it applies no matter where the oral or written misrepresentation
is made.

**Keep accurate and honest records.**

Citrix is committed to providing complete, accurate and timely information, in all material
respects, about the company's financial condition and business results. Citrix books and
records must always accurately and fairly reflect all transactions. Always make sure that
any documentation you submit or approve is complete, accurate, timely, and has the
appropriate authorization and signatures. This includes customer orders, costs, sales,
shipments, financial information, expense reports, time slips, the names of the parties
involved in a transaction, information provided in support of pricing exception requests,
incentives and rebates and all other important company information.

Never make or participate in false entries into Citrix business records.

Also remember:
• Only make commitments to customers and partners if you are authorized to do so
• All commitments to customers and agreements (oral and written) should be reviewed and
approved in accordance with Citrix policy
• Never alter or dispose of company records contrary to Citrix policies and procedures

94.    With regard to insider trading, the Code of Conduct provides as follows:

**Never use inside information to trade company stock**

Insider trading and stock tipping are criminal offenses in many countries in which Citrix does business. Please familiarize yourself with specific Citrix policies that apply to these activities.

                   *                    *                    *

You must always remember:
• Never disclose inside information to persons outside of Citrix, or to persons within Citrix who do not have a need to know, unless disclosure has been approved by the Chief Compliance Officer and is in the course of your job.

• It is illegal to trade in Citrix stock while in possession of inside information. You cannot trade until the information has been publicly disclosed. If you have any questions about whether it is safe to trade Citrix stock, you should ask the Chief Compliance Officer before trading.

### *Audit Committee Charter*

95.    The Company's Audit Committee Charter states that one of the Audit Committee's purposes is "overseeing procedures designed to improve the quality and reliability of the disclosure of the Corporation's financial condition and results of operations."

96.    The Audit Committee Charter also provides that the Audit Committee is responsible for "determining the effectiveness of the Corporation's disclosure controls and procedures." Furthermore, the Audit Committee Charter provides that the Audit Committee "shall direct the actions to be taken and/or make recommendations to the Board of actions to be taken to the extent such disclosures indicate the finding of any significant deficiencies or material weaknesses in internal controls or fraud."

97.    The Individual Defendants violated the Code of Conduct, the Audit Committee Charter, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust

enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. The Individual Defendants further violated the Code of Conduct when they caused the Company to waste corporate assets by repurchasing shares of its common stock at prices that were artificially inflated due to the false and misleading statements described herein. Moreover, seven of the Individual Defendants violated the Code of Conduct by selling Company shares at inflated prices for aggregate proceeds in excess of $22.5 million. Further in violation of the Code of Conduct and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

98.     Citrix is a Delaware corporation with its principal executive offices in Fort Lauderdale, Florida.

99.     The Company offers an "all-in-one" workspace solution for secure access to virtual apps and desktops. In recent years, the Company has sought to transition from offering its products on-premises to offering its products through the cloud and from offering perpetual licenses to offering subscription-based services.

100.    Throughout the Relevant Period, the Individual Defendants caused the Company to repeatedly tout the success of the Company's transition to a cloud-based, subscription-based service, while failing to disclose material information concerning the problems besetting the transition.

### False and Misleading Statements Made During the Relevant Period

#### *January 22, 2020 Earnings Call*

101.    On January 22, 2020, the Company hosted a conference call for investors and

analysts to discuss its earnings for the fiscal period ended December 31, 2019.

102.    During the call, Defendant Henshall stated that the Company's "model transition continues to progress really well . . . coming ahead of the accelerated plan that we outlined just last year." He further stated that recent subscriptions "reflect[ed] the customer confidence in our strategy, roadmap and our ability to execute on where that market is going." Regarding the migration to the Company's cloud product, Defendant Henshall stated that it provides "lots of tools and services to optimize" customers' ability to maintain their infrastructure and "unlocks a lot of new capabilities that are really only available as a service."

### February 11, 2020 Conference

103.    On February 11, 2020, Defendant Henshall spoke at Goldman Sachs' Technology & Internet Conference, stating that the cloud gives customers "access to so many net new things that are only available as cloud."

### April 16, 2020 Proxy Statement

104.    On April 16, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Calderoni, Caldwell, Cohn, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Sacripanti, and Sherman solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

105.    The 2020 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Calderoni, Caldwell, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Sacripanti, and Sherman to the Board; (2) approve the Second Amended and Restated 2014 Equity Incentive Plan

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

(the "2014 Plan") to increase the total number of shares authorized for issuance, extend the term of the original plan, update the vesting provisions applicable for annual director awards, and make other changes to the Company's existing equity incentive plan; (3) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm; and (4) approve on an advisory basis the compensation of the Company's executives.

106.    The 2020 Proxy Statement contained a "Letter from our Chairman." In the letter, Defendant Calderoni stated that the Company "gained significant momentum in its business transition to a subscription-based business."

107.    The Chairman's letter in the 2020 Proxy Statement also linked the Company's purported "pay-for-performance" philosophy with the "momentum" in the Company's business transformation:

> Commitment to Pay-for-Performance. ***The Compensation Committee of the Board of Directors and the full Board have taken a thoughtful approach to aligning the metrics of performance-based awards with those that have driven and will continue to drive Citrix's business transformation and we are committed to pay-for-performance.*** For example:
> - Beginning in 2018 and for 2019, the Compensation Committee linked performance-based equity awards with subscription bookings as a percentage of total subscription and product bookings to directly align performance-based awards to Citrix's multi-year strategic business transition to a cloud-based subscription business. ***During the second quarter of 2019, and as discussed in the company's earnings announcement in July 2019, Citrix gained significant momentum in its business transition to a subscription-based business.***
> - Given this increased momentum, the Compensation Committee determined that the company had a unique opportunity to increase the acceleration of its transition, which, if successful, would advance long-term value creation for shareholders. Accordingly, beginning in 2020, the Committee decided to link performance-based equity awards with ARR growth, which, as we have discussed on our earning calls, is the metric best aligned with the company's business transition and strategy. ARR, in short, is the best indicator of the overall health and trajectory of the business because it captures the pace of Citrix's transition and is a forward-looking indicator of top line trends.

108.    The 2020 Proxy Statement also stated the following regarding the Board's risk

oversight functions:

> We view risk assessment and oversight as a primary component of our governance and management framework. To that end, our Board of Directors plays an active role in reviewing Citrix's corporate strategy and priorities, and holds management accountable for creating a culture that actively manages risk.
>
> Our Board of Directors, directly and through committees (as described below and as set forth in the relevant committee charters), is involved in risk oversight through direct decision-making authority with respect to significant matters as well as the ongoing oversight of management. Among other areas, ***the Board of Directors is directly involved in overseeing risks related to our corporate strategy, including product, go-to-market and sales strategy***, executive officer succession, business continuity, crisis preparedness and competitive and reputational risks. In addition, each committee of the Board of Directors oversees certain aspects of risk management and periodically reports and makes recommendations back to the full Board of Directors.

(Emphasis added.)

109.    The 2020 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Daleo (as Chair), Demo, Hogan, and Kilcoyne. Specifically, the 2020 Proxy Statement provided as follows:

> The Audit Committee has responsibility for overseeing our internal financial and accounting controls, work performed by our independent registered public accounting firm and our internal audit function, overseeing our enterprise risk management (ERM) program, and overseeing risks related to our investments, financing activities, capital allocation strategies and insurance programs. As part of its oversight function, the Audit Committee regularly reviews the compliance policies and processes by which our exposure to certain significant areas of risk is assessed and managed. The Audit Committee also regularly discusses with management and our independent registered public accounting firm our major financial and controls-related risk exposures and steps that management has taken to monitor and control such exposures. In addition, under the supervision of the Audit Committee, Citrix established a Helpline available to all employees for the anonymous and confidential submission of complaints relating to any matter to encourage employees to report questionable activities directly to our Audit Committee.

110.    The 2020 Proxy Statement also stated the following regarding the purpose behind the 2014 Plan:

*Equity-based compensation is crucial to our recruitment and retention strategy.*

Equity-based compensation helps us recruit top talent. Our recruitment, retention and motivation of employees is dependent upon our ability to pay appropriate levels of compensation in the form of equity incentives. We believe that grants of equity allow us to remain competitive in the marketplace, enabling us to continue recruiting, retaining and motivating high-caliber talent dedicated to our long-term growth and success.

To remain successful, we must be able to compete for top talent. The equity awards that we grant to new hires are generally sized to take into account the amount of equity awards forfeited by the employee upon departure from his or her prior employer as well as an appropriately sized new hire award to incentivize the employee to join and remain with Citrix. These awards vest over three years, with one-third of the units vesting on the first, second and third anniversaries of the date of the award agreement and are expected by candidates and are therefore necessary elements of attracting and retaining talent.

*Equity-based compensation aligns employee and shareholder interests.*

Equity compensation is critical to aligning the interests of our employees with those of our shareholders. By making equity a significant portion of our employees' compensation, we are linking our employees' compensation to the performance of Citrix and the interests of our shareholders. We grant equity awards in the form of restricted stock units which expose the award recipient to both the downside and the upside of our stock performance. We further align our senior executives with performance-based restricted stock units aligned with our business to drive long-term sustainable growth, further aligning the interests of our employees with those of our shareholders. Our long-term goal is to motivate employees to conduct business in a manner that produces superior return over the long-term. We believe that our equity-based compensation awards have contributed to our significant outperformance against the S&P 500 and Nasdaq Index over the five-year period . . . .

111.    The 2020 Proxy Statement provided that persons eligible to participate in the 2014 Plan included "***full or part-time officers, employees, non-employee directors and consultants*** selected from time to time by the Compensation Committee in its discretion." (Emphasis added.) Moreover, it stated that: "Our Board of Directors anticipates that ***providing such persons with a direct stake in Citrix will more closely align the interests of such individuals with those of Citrix and our shareholders***, thereby encouraging their efforts on our behalf and strengthening their desire to remain with us." (Emphasis added.) Furthermore, the 2014 Plan provided that the Compensation Committee, which at that time was composed of Defendants Caldwell, Gopal, and

Sacripanti, "**has full power to select, from among the individuals eligible for awards, the individuals to whom awards will be granted**, to make any combination of awards to participants, and to determine the specific terms and conditions of each award, subject to the provisions of the [2014 Plan]." (Emphasis added.) Thus, Defendants Caldwell, Gopal, and Sacripanti had full power to grant awards to any of the then-serving directors under the 2014 Plan.

112.    The 2020 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2020 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation, not aligning their interests with the Company and its other shareholders, by seeking shareholder approval of the amendment to the 2014 Plan.

113.    The 2020 Proxy Statement also failed to disclose that: (1) the Company was struggling to transition customers to a subscription-based model and from on-premises offerings to cloud-based offerings; and (2) the Company failed to maintain adequate internal controls.

114.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia*: (1) reelected Defendants Calderoni, Caldwell, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Sacripanti, and Sherman to the Board, allowing them to continue breaching their fiduciary duties to Citrix; (2) approved the 2014 Plan, allowing the Individual Defendants to receive more unjust compensation; and (3) approved on an advisory basis the compensation of the Company's executives, further allowing Defendants Henshall,

Shenkman, and Hough to receive more unjust compensation.

### May 12, 2020 Conference

115.    On May 12, 2020, Defendant Shenkman spoke at J.P. Morgan's Global Technology, Media and Communications Conference. He stated that conversion to the cloud "helps [customers] get additional technical benefit."

### July 23, 2020 Earnings Letter

116.    On July 23, 2020, the Company issued a letter setting forth its financial results for the second quarter of 2020. The letter was filed as an exhibit to a current report filed on Form 8-K with the SEC. In the letter, the Company reported that "*[o]ur subscription model transition regained momentum in the second quarter.*" (Emphasis added.) The Company further explained that "[t]he subscription model transition serves as a bridge from legacy on-premises perpetual license and maintenance to the cloud."

### July 31, 2020 Form 10-Q

117.    On July 31, 2020, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2020 (the "2Q20 10-Q"). It was signed by Defendant Shenkman and contained certifications, signed by Defendants Henshall and Shenkman, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 attesting to the accuracy of the financial statements contained in the 2Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

118.    The 2Q20 10-Q stated that "[d]uring the three months ended June 30, 2020, *our subscription model transition regained momentum.*" (Emphasis added.)

### September 9, 2020 Conference

119.     On September 9, 2020, Defendant Henshall spoke at Citi's 2020 Global Virtual Technology Conference. In response to an analyst statement that the Company had seen very good growth in subscription and in cloud-based services, Defendant Henshall stated that Citrix was "*making great progress*" in its business model transition. (Emphasis added.)

### October 22, 2020 Conference Call

120.     On October 22, 2020, the Company hosted a conference call for investors and analysts to discuss the Company's financial results for the fiscal quarter ended September 30, 2020. During the call, Defendant Henshall stated that "*the subscription model transition is progressing really well.*" (Emphasis added.) He further stated that the Company was "very well positioned in the long term."

121.     During the call, an analyst asked "Can you give us an update on the economics of the subscription cloud transition? . . . [Y]ou talked last year about a revenue lift from a license moving to subscription versus license to SaaS. Is that still how you're thinking about that?" In response, Defendant Henshall stated that, "*in terms of the overall execution, it's going really well.*" (Emphasis added.)

### November 17, 2020 Conference

122.     On November 17, 2020, Defendant Hough spoke at RBC Capital Markets' Global Technology, Internet, Media and Telecommunications Conference. In discussing transitioning to the cloud, Defendant Hough stated that customers "get access to a world of services that you previously didn't."

### December 7, 2020 Conference

123.     On December 7, 2020, Defendant Schmitz spoke at the Raymond James Technology Investors Conference. Defendant Schmitz stated that the Company's goal regarding

transitioning customers from Short-Term Continuity Licenses "isn't necessarily to just capture these licenses and make sure that they move forward for another year. It's really about transitioning the customer to be on a preferred platform, which in this case is our Cloud platform." He stated that the Company's Citrix Cloud environments offer customers "greater access to innovation, highly valued capabilities that are not available on-premise." Defendant Schmitz also characterized demand for cloud services as higher than it was in early 2020, stating that "***customers' appetite for cloud migration is actually higher than it was in the start of the pandemic***" and that "***the sentiment is quite positive on cloud migration***." (Emphasis added.)

### *January 19, 2021 Earnings Letter*

124.    On January 19, 2021, the Company issued a letter setting forth its financial results for the fourth quarter of 2020. The letter was filed as an exhibit to a current report filed on Form 8-K with the SEC on the same day. The letter touted "strong on-going demand for the Citrix Workspace and ***an acceleration of our customers adopting Citrix Cloud to manage their workspace environments.***" (Emphasis added.) The letter further touted "***an acceleration in the transition of our installed base to the cloud.***" (Emphasis added.)

### *January 21, 2021 Conference Call*

125.    On January 21, 2021, the Company hosted a conference call for investors and analysts to discuss the Company's financial results for the fiscal period ended December 31, 2020. During the call, Defendant Henshall stated that the Company's "strong growth" was "our installed base, moving more aggressively to Citrix Cloud." He further stated that "with the large majority of our business on a subscription model, we're focused on moving even faster in our transition to the cloud." He also stated that "we've just been really focused over the back half of the year on migrating the installed base to cloud. ***We've seen great success with that*** . . . ." (Emphasis added.)

126.    The statements contained in ¶¶ 102–03 and 115–125 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was struggling to transition customers to a subscription-based model and from on-premises offerings to cloud-based offerings; and (2) the Company failed to maintain adequate internal controls. As a result of the foregoing, Citrix's public statements were materially false and misleading at all relevant times.

### *April 16, 2021 Proxy Statement*

127.    On April 16, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Calderoni, Caldwell, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Knowling, Sacripanti, and Sherman solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

128.    The 2021 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Calderoni, Caldwell, Demo, Gopal, Henshall, Hogan, Kilcoyne, Knowling, Sacripanti, and Sherman to the Board; (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm; and (3) approve on an advisory basis the compensation of the Company's executives.

129.    The 2021 Proxy Statement contained a "Letter from our Chairman." In the letter, Defendant Calderoni stated as follows: "As we enter fiscal year 2021 with a portion of our subscription model transition complete, we continue to focus on transitioning our customers to the

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

cloud."

130.   The Chairman's letter in the 2021 Proxy Statement also linked the Company's

compensation practices with the Company's purported progress in transitioning to a subscription-

based business:

> Commitment to pay-for-performance. ***The Compensation Committee of the Board of Directors and the full Board continually reevaluate and take a thoughtful approach to aligning the metrics of performance-based awards with those that have driven and will continue to drive Citrix's business transformation. We are committed to pay-for-performance.*** For example:
>
> - Beginning in 2018 and for 2019, the Compensation Committee linked performance-based equity awards with subscription bookings as a percentage of total subscription and product bookings to directly align performance-based awards to Citrix's multi-year strategic business transition to a cloud-based subscription business. ***During the second quarter of 2019, and as discussed in the company's earnings announcement in July 2019, Citrix gained significant momentum in its business transition to a subscription-based business.***
> - ***Given this increased momentum, the Compensation Committee determined that the company had a unique opportunity to increase the acceleration of its transition, which, if successful, would advance long-term value creation for shareholders.*** Accordingly, beginning in 2020, the Compensation Committee moved away from subscription bookings as a percentage of total subscription and product bookings and decided to link performance-based equity awards with annualized recurring revenue, or ARR, growth, which, as we have discussed on our earnings calls, is the metric that we believe is best aligned with the company's business transition and strategy. In our view, ARR, in short, is the best indicator of the overall health and trajectory of the business because it captures the pace of Citrix's transition and is a forward-looking indicator of top line trends.
> - ***As we enter fiscal year 2021 with a portion of our subscription model transition complete, we continue to focus on transitioning our customers to the cloud.*** As a result, the Compensation Committee decided to link performance-based equity awards granted during fiscal year 2021 with Software-as-a-Service ARR, or SaaS ARR, growth, rather than ARR growth, to further drive our business model transition to the cloud.

(Emphasis added.)

131.   The 2021 Proxy Statement also stated the following regarding the Board's risk

oversight functions:

We view risk assessment and oversight as a primary component of our governance and management framework. To that end, our Board of Directors plays an active role in reviewing Citrix's corporate strategy and priorities, and holds management accountable for creating a culture that actively manages risk.

Our Board of Directors, directly and through committees (as described below and as set forth in the relevant committee charters), is involved in risk oversight through direct decision-making authority with respect to significant matters as well as the ongoing oversight of management. Among other areas, *the Board of Directors is directly involved in overseeing risks related to our corporate strategy, including product strategy, corporate development*, and mergers and acquisitions, executive officer succession, business continuity, crisis preparedness and competitive and reputational risks. In addition, each committee of the Board of Directors oversees certain aspects of risk management and periodically reports and makes recommendations back to the full Board of Directors.

(Emphasis added.)

132.    The 2021 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Daleo, Demo (as Chair), Hogan, and Sherman. Specifically, the 2021 Proxy Statement provided as follows:

The Audit Committee is responsible for overseeing our internal financial and accounting controls, work performed by our independent registered public accounting firm and our internal audit function, overseeing our enterprise risk management (ERM) program, and overseeing risks related to our investments, financing activities, capital allocation strategies and insurance programs. As part of its oversight function, the Audit Committee regularly reviews the compliance policies and processes by which our exposure to certain significant areas of risk is assessed and managed. The Audit Committee also regularly discusses with management and our independent registered public accounting firm our major financial and controls-related risk exposures and steps that management has taken to monitor and control such exposures. In addition, under the supervision of the Audit Committee, Citrix established a Helpline available to all employees for the anonymous and confidential submission of complaints relating to any matter to encourage employees to report questionable activities directly to our Audit Committee.

133.    The 2021 Proxy Statement was materially misleading because it failed to disclose that, contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately

exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

134.    The 2021 Proxy Statement also failed to disclose that: (1) the Company was struggling to transition customers to a subscription-based model and from on-premises offerings to cloud-based offerings; and (2) the Company failed to maintain adequate internal controls.

135.    As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders reelected Defendants Calderoni, Caldwell, Demo, Gopal, Henshall, Hogan, Kilcoyne, Knowling, Sacripanti, and Sherman to the Board, allowing them to continue breaching their fiduciary duties to Citrix, and approved on an advisory basis the compensation of the Company's executives, allowing Defendants Henshall, Shenkman, and Hough to receive more unjust compensation.

### The Truth Emerges

*April 29, 2021 Earnings Call*

136.    On April 29, 2021, the Company hosted a conference call for investors and analysts to discuss the Company's financial results for the fiscal quarter ended March 31, 2021. During the call, Defendant Henshall noted that customers had not transitioned from Short-Term Continuity Licenses to "long-term contract[s]" as anticipated. He noted that, ***"[i]n reality, [customers] rolled into another short-term duration***" contract. (Emphasis added.)

137.    On this news, the Company's share price declined by $10.49, or approximately 7.6%, from its April 28, 2021 closing price of $138.51 per share to close April 29, 2021 at $126.58.

*July 29, 2021 Earnings Letter and Investor Call*

138.    On July 29, 2021, the Company issued a letter to stakeholders setting forth the Company's financial results for the second fiscal quarter of 2021. The letter was filed as an exhibit

to a current report filed on Form 8-K with the SEC on the same day. In the letter, Defendant Henshall linked the Company's weak revenues with difficulties transitioning customers to the cloud, stating specifically that reported revenue "reflects the ***challenge associated with transitioning the business to SaaS*** and the need to evolve our sales strategy to deliver more predictable results."(Emphasis added.) The letter also announced, *inter alia*, a reorganization of the Company's sales team. Referring to the reorganization of the sales team and other "significant and immediate actions" taken to address challenges facing the Company, the letter stated that "these actions are significant and may cause short-term disruption before yielding tangible results."

139.    Also on July 29, 2021, the Company hosted a conference call for investors and analysts to discuss the Company's financial results for the fiscal quarter ended June 30, 2021. During the call, an analyst noted that issues facing Citrix "sound like they kind of evolved over time" and asked whether the Company's announcements amounted to "the culmination of kind of a realization on the management team that something needs to change?" To this question, Defendant Henshall responded, "I think that's fair." He also stated, "***We've just had problems*** with really managing and ***accurately forecasting a lot of these new business areas.***" (Emphasis added.)

140.    Following the July 29, 2021 disclosures, the Company's share price declined by $15.55 per share—approximately 13.6%—from its July 28, 2021 closing price of $114.55 to close at $99.00 per share on July 29, 2021.

### *October 6, 2021 Press Release*

141.    On October 6, 2021, the Company issued a press release after markets closed. In the press release, Citrix announced that Defendant Henshall was stepping down as President and CEO and as a member of the Company's Board. The press release further stated that Defendant Calderoni, who is Chairman of the Board, had been named interim CEO and President, effective

immediately.

142.    On this news, the Company's share price declined by $7.64 per share over two days, or 7.2%, from its October 6, 2021 closing price of $105.96 to close at $98.32 on October 8, 2021.

## Repurchases

143.    During the period in which the Company made false and misleading statements and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, from January 1, 2020[3] through September 30, 2021, the Company spent an aggregate amount of over $1.51 billion[4] to repurchase approximately 11,511,097 shares[5] of its own common stock at artificially inflated prices.

144.    According to the Company's Form 10-Q filed with the SEC on May 5, 2020, during January 2020, the Company purchased 8,423,821 shares of its common stock at an average price of $121.15 per share, for a total cost of approximately $1.02 billion.

145.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $192.3 million for repurchases of its own stock during January 2020.

146.    According to the Company's Form 10-Q filed with the SEC on May 5, 2020, during February 2020, the Company purchased 19,713 shares of its common stock at an average

---

[3] Upon information and belief, some of the repurchases reported between January 1 and January 31, 2020 were made while the price of the Company's shares was artificially inflated due to the false and misleading statements discussed herein.

[4] Of this amount, at least $288.5 million was expended on open market purchases. Specifically, the Company disclosed that "during the year ended December 31, 2020, we expended $288.5 million on open market purchases under the stock repurchase program, repurchasing 2.5 million shares of outstanding common stock at an average price of $116.40."

[5] According to the Company, for example in the Form 10-Q and the Form 10-K filed on May 5, 2020 and February 8, 2021, respectively, these shares include "shares withheld from restricted stock units . . . to satisfy minimum tax withholding obligations that arose on the vesting of restricted stock units."

price of $105.22 per share, for a total cost of approximately $2.07 million.

147.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $136,019.70 for repurchases of its own stock during February 2020.

148.    According to the Company's Form 10-Q filed with the SEC on May 5, 2020, during March 2020, the Company purchased 299,670 shares of its common stock at an average price of $142.31 per share, for a total cost of approximately $42.65 million.

149.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $13.18 million for repurchases of its own stock during March 2020.

150.    According to the Company's Form 10-Q filed with the SEC on July 31, 2020, during April 2020, the Company purchased 213,597 shares of its common stock at an average price of $139.20 per share, for a total cost of approximately $29.7 million.

151.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $8.7 million for repurchases of its own stock during April 2020.

152.    According to the Company's Form 10-Q filed with the SEC on July 31, 2020, during May 2020, the Company purchased 13,387 shares of its common stock at an average price of $143.28 per share, for a total cost of approximately $1.9 million.

153.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $601,879.52 for repurchases of its own stock during May 2020.

154.    According to the Company's Form 10-Q filed with the SEC on July 31, 2020,

during June 2020, the Company purchased 29,392 shares of its common stock at an average price of $141.60 per share, for a total cost of approximately $4.16 million.

155.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $1.27 million for repurchases of its own stock during June 2020.

156.    According to the Company's Form 10-Q filed with the SEC on October 30, 2020, during July 2020, the Company purchased 17,840 shares of its common stock at an average price of $144.94 per share, for a total cost of approximately $2.59 million.

157.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $831,700.80 for repurchases of its own stock during July 2020.

158.    According to the Company's Form 10-Q filed with the SEC on October 30, 2020, during August 2020, the Company purchased 849,215 shares of its common stock at an average price of $235.51 per share, for a total cost of approximately $200 million.

159.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $116.5 million for repurchases of its own stock during August 2020.

160.    According to the Company's Form 10-Q filed with the SEC on October 30, 2020, during September 2020, the Company purchased 7,970 shares of its common stock at an average price of $138.50 per share, for a total cost of approximately $1.1 million.

161.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $320,234.60 for repurchases of its own stock during September 2020.

162.    According to the Company's Form 10-K filed with the SEC on February 8, 2021, during October 2020, the Company purchased 310,561 shares of its common stock at an average price of $122.65 per share, for a total cost of approximately $38.1 million.

163.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $7.56 million for repurchases of its own stock during October 2020.

164.    According to the Company's Form 10-K filed with the SEC on February 8, 2021, during November 2020, the Company purchased 508,194 shares of its common stock at an average price of $118.40 per share, for a total cost of approximately $60.17 million.

165.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $10.2 million for repurchases of its own stock during November 2020.

166.    According to the Company's Form 10-K filed with the SEC on February 8, 2021, during December 2020, the Company purchased 56,241 shares of its common stock at an average price of $126.68 per share, for a total cost of approximately $7.12 million.

167.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $1.6 million for repurchases of its own stock during December 2020.

168.    According to the Company's Form 10-Q filed with the SEC on May 6, 2021, during January 2021, the Company purchased 112,466 shares of its common stock at an average price of $143.14 per share, for a total cost of approximately $16.1 million.

169.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $5.04 million for repurchases

of its own stock during January 2021.

170.     According to the Company's Form 10-Q filed with the SEC on May 6, 2021, during February 2021, the Company purchased 45,761 shares of its common stock at an average price of $132.50 per share, for a total cost of approximately $6.06 million.

171.     As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $1.56 million for repurchases of its own stock during February 2021.

172.     According to the Company's Form 10-Q filed with the SEC on May 6, 2021, during March 2021, the Company purchased 177,120 shares of its common stock at an average price of $138.80 per share, for a total cost of approximately $24.58 million.

173.     As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $7.17 million for repurchases of its own stock during March 2021.

174.     According to the Company's Form 10-Q filed with the SEC on July 30, 2021, during April 2021, the Company purchased 387,965 shares of its common at an average price of $139.94 per share, for a total cost of approximately $54.29 million.

175.     As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $16.15 million for repurchases of its own stock during April 2021.

176.     According to the Company's Form 10-Q filed with the SEC on July 30, 2021, during May 2021, the Company purchased 1,152 shares of its common stock at an average price of $120.98 per share, for a total cost of approximately $139,368.96.

177.     As the Company's stock was actually worth only $98.32 per share, the price at

closing on October 8, 2021, the Company overpaid by approximately $26,104.32 for repurchases of its own stock during May 2021.

178.    According to the Company's Form 10-Q filed with the SEC on July 30, 2021, during June 2021, the Company purchased 4,720 shares of its common stock at an average price of $115.09 per share, for a total cost of approximately $543,224.80.

179.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $79,154.40 for repurchases of its own stock during June 2021.

180.    According to the Company's Form 10-Q filed with the SEC on November 8, 2021, during July 2021, the Company purchased 14,764 shares of its common stock at an average price of $110.36 per share, for a total cost of approximately $1.63 million.

181.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $177,758.56 for repurchases of its own stock during July 2021.

182.    According to the Company's Form 10-Q filed with the SEC on November 8, 2021, during August 2021, the Company purchased 10,167 shares of its common stock at an average price of $101.96 per share, for a total cost of approximately $1.04 million.

183.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $37,007.88 for repurchases of its own stock during August 2021.

184.    According to the Company's Form 10-Q filed with the SEC on November 8, 2021, during September 2021, the Company purchased 7,381 shares of its common stock at an average price of $102.73 per share, for a total cost of approximately $758,250.13.

185.    As the Company's stock was actually worth only $98.32 per share, the price at closing on October 8, 2021, the Company overpaid by approximately $32,550.21 for repurchases of its own stock during September 2021.

186.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $383.5 million.

## DAMAGES TO CITRIX

187.    As a direct and proximate result of the Individual Defendants' misconduct, Citrix has lost and will continue to lose and expend many millions of dollars.

188.    Such losses include the Company's overpayment by approximately $383.5 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

189.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's former CEO, interim CEO, CFO, former CPO, and COO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

190.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including any unjust compensation paid to the Individual Defendants in connection with the 2014 Plan.

191.    As a direct and proximate result of the Individual Defendants' conduct, Citrix has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust

enrichment.

## DERIVATIVE ALLEGATIONS

192.    Plaintiff brings this action derivatively and for the benefit of Citrix to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Citrix, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

193.    Citrix is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

194.    Plaintiff is, and has been at all relevant times, a shareholder of Citrix. Plaintiff will adequately and fairly represent the interests of Citrix in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

195.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

196.    A pre-suit demand on the Board of Citrix is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Calderoni, Caldwell, Demo, Hogan, Kilcoyne, Knowling, Sacripanti, Sherman (the "Directors"). Plaintiff needs only to allege demand futility as to four of eight Directors who are on the Board at the time this action is commenced.

197.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they

engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. Furthermore, while the price of the Company's securities was artificially inflated due to the false and misleading statements and omissions of material facts, the Directors caused the Company to overpay in repurchasing millions its own shares, while three of them conducted insider sales for proceeds of approximately $4.81 million. As a result of the foregoing, the Directors are unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

198.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

199.    Additional reasons that demand on Defendant Calderoni is futile follow. Defendant Calderoni has served on the Board since June 2014 and was the Board's Executive Chairman from July 2015 through December 2018. In addition, he currently serves as Chairman of the Board and as Interim President and CEO. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Calderoni with his principal occupation for which he receives handsome compensation, including compensation paid under the 2014 Plan which was approved in part due to the false and misleading statements for which the Individual Defendants who solicited the 2020 Proxy Statement are responsible. Both the 2020 Proxy Statement and 2021 Proxy Statement were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. Moreover, both the 2020 Proxy Statement and

2021 Proxy Statement contained a "Letter from our Chairman" containing false and misleading statements by Defendant Calderoni. As Chairman of the Board during the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Calderoni is a defendant in the Securities Class Action. Furthermore, during the Relevant Period, he sold 29,591 shares of Company common stock at artificially inflated prices for proceeds of approximately $4.36 million. For these reasons, Defendant Calderoni breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Caldwell is futile follow. Defendant Caldwell has served as a Company director since July 2008. During the Relevant Period and into the present, she has served as the Company's Lead Independent Director, and she also served during the Relevant Period as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. As Lead Independent Director and Chair of the Nominating and Corporate Governance Committee, she receives significant compensation from the Company, including compensation paid under the 2014 Plan which was approved in part due to the false and misleading statements for which the Individual Defendants who solicited the 2020 Proxy Statement are responsible. Moreover, both the 2020 Proxy Statement and 2021 Proxy Statement were solicited on her behalf and the false and misleading statements contained therein contributed to her reelection to the Board. As a long-serving trusted Company director and as Lead Independent Director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal

controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, during the Relevant Period, she sold 2,131 shares of Company common stock at artificially inflated prices for proceeds of approximately $277,283. For these reasons, Defendant Caldwell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.     Additional reasons that demand on Defendant Demo is futile follow. Defendant Demo has served as a Company director since February 2005. He served during the Relevant Period as Chair of the Audit Committee and as a member of the Technology, Data and Information Security Committee. As a Company director, he receives significant compensation from the Company, including compensation paid under the 2014 Plan which was approved in part due to the false and misleading statements for which the Individual Defendants who solicited the 2020 Proxy Statement are responsible. Moreover, both the 2020 Proxy Statement and 2021 Proxy Statement were solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Demo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.     Additional reasons that demand on Defendant Hogan is futile follow. Defendant Hogan has served as a Company director since December 2018. He served during the Relevant Period as a member of the Audit Committee and the Nominating and Corporate Governance

Committee. As a Company director, he receives significant compensation from the Company, including compensation paid under the 2014 Plan which was approved in part due to the false and misleading statements for which the Individual Defendants who solicited the 2020 Proxy Statement are responsible. Moreover, the 2020 Proxy Statement and the 2021 Proxy Statement were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hogan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Kilcoyne is futile follow. Defendant Kilcoyne has served as a Company director since June 2018. She served during the Relevant Period as Chair of the Technology, Data and Information Security Committee. As a Company director, she receives significant compensation from the Company, including compensation paid under the 2014 Plan which was approved in part due to the false and misleading statements for which the Individual Defendants who solicited the 2020 Proxy Statement are responsible. Moreover, the 2020 Proxy Statement and the 2021 Proxy Statement were solicited on her behalf, and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Kilcoyne breached her fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

204.    Additional reasons that demand on Defendant Knowling is futile follow. Defendant Knowling has served as a Company director since October 2020. He served during the Relevant Period as a member of the Compensation Committee. As a Company director, he receives significant compensation from the Company, including compensation paid under the 2014 Plan which was approved in part due to the false and misleading statements for which the Individual Defendants who solicited the 2020 Proxy Statement are responsible. Moreover, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Knowling breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205.    Additional reasons that demand on Defendant Sacripanti is futile follow. Defendant Sacripanti has served as a Company director since September 2015. He served during the Relevant Period as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As a Company director, he receives significant compensation from the Company, including compensation paid under the 2014 Plan which was approved in part due to the false and misleading statements for which the Individual Defendants who solicited the 2020 Proxy Statement are responsible. Moreover, the 2020 Proxy Statement and the 2021 Proxy Statement were solicited on his behalf, and the false and misleading statements contained therein

contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, during the Relevant Period, he sold 1,282 shares of Company common stock at artificially inflated prices for proceeds of approximately $171,453. For these reasons, Defendant Sacripanti breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206.    Additional reasons that demand on Defendant Sherman is futile follow. Defendant Sherman has served as a Company director since March 2020, and he served as a member of the Audit Committee during the Relevant Period. As a Company director, he receives significant compensation from the Company, including compensation paid under the 2014 Plan which was approved in part due to the false and misleading statements for which the Individual Defendants who solicited the 2020 Proxy Statement are responsible. Moreover, the 2020 Proxy Statement and the 2021 Proxy Statement were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sherman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

207.    Additional reasons that demand on the Board is futile follow.

208.     The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Director Calderoni is a member of the Board of Directors of ANSYS, Inc., a software company where Defendant Gopal serves as President and CEO. Director Calderoni also served as Chairman and CEO of Ariba, Inc., a cloud applications company, from October 2001 until it was acquired by SAP in October 2012, and then continued serving as CEO of Ariba until January 2014. Defendant Schmitz served as Senior Vice President and COO of SAP Ariba from October 2012 to December 2013. Moreover, Defendant Shenkman also served at SAP in senior roles. Specifically, from January 2012 to January 2015, Defendant Shenkman served as SAP's Global Head of Corporate Development. Additionally, Directors Calderoni and Sacripanti and Defendant Henshall served on the Board of Directors of LogMeIn, Inc., a then publicly-traded remote access and remote software company, from 2017 to 2020. Furthermore, four Individual Defendants have held roles at IBM: Directors Calderoni, Hogan, Kilcoyne, and Sherman. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

209.     Defendants Daleo, Demo, Hogan, and Sherman (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period, with Defendant Daleo and Defendant Demo each serving as Chair for a portion of the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*: (1) overseeing procedures designed to improve the quality and reliability of the disclosure of the Corporation's financial condition and results of operations; (2) determining the effectiveness of the Corporation's disclosure controls and procedures; (3)

overseeing the accounting and financial reporting processes of the Company; and (4) reviewing and taking steps to remedy any deficiencies with the Company's system of internal controls. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, failed to identify or remedy deficiencies with the Company's disclosure controls and internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

210.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

211.    Citrix has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Citrix any part of the damages Citrix suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

212.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As each of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

213.    The acts complained of herein constitute violations of fiduciary duties owed by Citrix's officers and directors, and these acts are incapable of ratification.

214.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Citrix. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Citrix, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

215.    If there is no directors' and officers' liability insurance, then the Directors will not cause Citrix to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

216.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Defendants Calderoni, Caldwell, Cohn, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Knowling, Sacripanti, and Sherman for Violations of Section 14(a) of the Exchange Act[6]**

217.     Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs 1 through 216, as though fully set forth herein.

218.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

219.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

---

[6] As to the 2020 Proxy Statement, this claim is against Defendants Calderoni, Caldwell, Cohn, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Sacripanti, and Sherman. As to the 2021 Proxy Statement, this claim is against Defendants Calderoni, Caldwell, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Knowling, Sacripanti, and Sherman.

220.    Under the direction and watch of the Defendants Calderoni, Caldwell, Cohn, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Sacripanti, and Sherman, the 2020 Proxy Statement failed to disclose, *inter alia*, that: (1) contrary to the 2020 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation, not aligning their interests with the Company and its other shareholders, by seeking shareholder approval of the 2014 Plan.

221.    The 2020 Proxy Statement further failed to disclose that: (1) the Company was struggling to transition customers to a subscription-based model and from on-premises offerings to cloud-based offerings; and (2) the Company failed to maintain adequate internal controls.

222.    In the exercise of reasonable care, Calderoni, Caldwell, Cohn, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Sacripanti, and Sherman should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, the election of Defendants Calderoni, Caldwell, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Sacripanti, and Sherman to the Board, the approval of the 2014 Plan, and the approval on an advisory basis of the compensation of the Company's executives, including Defendants Henshall, Shenkman, and Hough.

223.    The false and misleading elements of the 2020 Proxy Statement led to, among other

things: (1) the approval on an advisory basis of the compensation of the Company's executives, including Defendants Henshall, Shenkman, and Hough; (2) the election of the Defendants Calderoni, Caldwell, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Sacripanti, and Sherman to the Board, which allowed them to continue to breach their fiduciary duties to Citrix; and (3) the approval of 2014 Plan, allowing the Individual Defendants to receive more unjust compensation.

224.  Under the direction and watch of the Defendants Calderoni, Caldwell, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Knowling, Sacripanti, and Sherman, the 2021 Proxy Statement failed to disclose, *inter alia*, that contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

225.  The 2021 Proxy Statement further failed to disclose that: (1) the Company was struggling to transition customers to a subscription-based model and from on-premises offerings to cloud-based offerings; and (2) the Company failed to maintain adequate internal controls. As a result, the 2021 Proxy Statement were materially false and misleading.

226.  In the exercise of reasonable care, Defendants Calderoni, Caldwell, Daleo, Demo, Gopal, Henshall, Hogan, Kilcoyne, Knowling, Sacripanti, and Sherman should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of Calderoni, Caldwell, Demo, Gopal, Henshall, Hogan, Kilcoyne, Knowling, Sacripanti, and Sherman, and the approval

on an advisory basis of the compensation of the Company's executives, including Defendants Henshall, Shenkman, and Hough.

227.    The false and misleading elements of the 2021 Proxy Statement led to, among other things: (1) the approval on an advisory basis of the compensation of the Company's executives, including Defendants Henshall, Shenkman, and Hough; and (2) the election of Defendants Calderoni, Caldwell, Demo, Gopal, Henshall, Hogan, Kilcoyne, Knowling, Sacripanti, and Sherman to the Board, which allowed them to continue to breach their fiduciary duties to Citrix.

228.    The Company was damaged as a result of the Defendants Calderoni's, Caldwell's, Cohn's, Daleo's, Demo's, Gopal's, Henshall's, Hogan's, Kilcoyne's, Knowling's, Sacripanti's, and Sherman's material misrepresentations and omissions in the 2020 Proxy Statement and 2021 Proxy Statement.

229.    Plaintiff, on behalf of Citrix, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

230.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in the foregoing paragraphs 1 through 216, as though fully set forth herein.

231.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Citrix. Not only is Citrix now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Citrix by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices on the open market and in private

transactions, damaging Citrix.

232.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and SEC filings.

233.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Citrix not misleading.

234.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Citrix.

235.    The Individual Defendants acted with scienter, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

236.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

237.    Plaintiff on behalf of Citrix has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

238.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in the foregoing paragraphs 1 through 216, as though fully set forth herein.

239.    The Individual Defendants, by virtue of their positions with Citrix and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Citrix and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Citrix and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

240.    Plaintiff on behalf of Citrix has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

241.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs 1 through 216, as though fully set forth herein.

242.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Citrix's business and affairs.

243.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

244.    The Individual Defendants' conduct set forth herein was due to their intentional or

reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Citrix.

245.    In breach of their fiduciary duties owed to Citrix, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was struggling to transition customers to a subscription-based model and from on-premises offerings to cloud-based offerings; and (2) the Company failed to maintain adequate internal controls. As a result of the foregoing, Citrix's public statements were materially false and misleading at all relevant times.

246.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while seven of them conducted insider sales of Company common stock for proceeds of approximately $22.5 million, which renders them personally liable to the Company for breaching their fiduciary duties.

247.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

248.    The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.

249.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately

maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Citrix's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

250.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

251.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Citrix has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

252.    Plaintiff on behalf of Citrix has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

253.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs 1 through 216, as though fully set forth herein.

254.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Citrix.

255.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Citrix that was tied to the performance or artificially inflated valuation of Citrix, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes compensation received under the 2014 Plan which certain Individual Defendants induced the

Company's shareholders to approve through false and misleading representations in the 2020 Proxy Statement.

256.     Plaintiff, as a shareholder and a representative of Citrix, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

257.     Plaintiff on behalf of Citrix has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Abuse of Control

258.     Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs 1 through 216, as though fully set forth herein.

259.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Citrix, for which they are legally responsible.

260.     As a direct and proximate result of the Individual Defendants' abuse of control, Citrix has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

261.     Plaintiff on behalf of Citrix has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

262.     Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs 1 through 216, as though fully set forth herein.

263.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of Citrix in a manner consistent with the operations of a publicly-held corporation.

264. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Citrix has sustained and will continue to sustain significant damages.

265. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

266. Plaintiff on behalf of Citrix has no adequate remedy at law.

## EIGHTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

267. Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs 1 through 216, as though fully set forth herein.

268. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

269. The Individual Defendants caused the Company to repurchase millions of shares of the Company's common stock at prices that were artificially inflated due to the false and misleading statements discussed herein.

270. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Citrix to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

271. As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

272.     Plaintiff on behalf of Citrix has no adequate remedy at law.

## NINTH CLAIM

**Against Defendants Henshall, Calderoni, Shenkman, Hough, and Schmitz for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

273.     Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs 1 through 216, as though fully set forth herein.

274.     Citrix and Defendants Henshall, Calderoni, Shenkman, Hough, and Schmitz are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Henshall's, Calderoni's, Shenkman's, Hough's, and Schmitz's willful and/or reckless violations of their obligations as officers and/or directors of Citrix.

275.     Defendants Henshall, Calderoni, Shenkman, Hough, and Schmitz, because of their positions of control and authority as CEO, Chairman, CFO, CPO, and COO of Citrix, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Citrix, including the wrongful acts complained of herein and in the Securities Class Action.

276.     Accordingly, Defendants Henshall, Calderoni, Shenkman, Hough, and Schmitz are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

277.     As such, Citrix is entitled to receive all appropriate contribution or indemnification from Defendants Henshall, Calderoni, Shenkman, Hough, and Schmitz.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Citrix, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Citrix;

(c)     Determining and awarding to Citrix the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Citrix and the Individual Defendants to take all necessary actions to reform and improve Citrix's corporate governance and internal procedures to comply with applicable laws and to protect Citrix and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Citrix to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Citrix restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: January 22, 2022                    Respectfully submitted,

                                           **THE LAW OFFICE OF JOSE D. SOSA, P.C.**

                                           /s/ Jose D. Sosa
                                           Jose D. Sosa
                                           Fla. Bar No. 150878
                                           1141 Via Jardin
                                           Palm Beach Gardens, FL 33418
                                           Telephone: (516) 670-8237
                                           Email: pepe@pepesosalaw.com
                                           sosalaw@yahoo.com

                                           **THE BROWN LAW FIRM, P.C.**
                                           Timothy Brown
                                           767 Third Avenue, Suite 2501
                                           New York, NY 10017
                                           Telephone: (516) 922-5427
                                           Facsimile: (516) 344-6204
                                           Email: tbrown@thebrownlawfirm.net

                                           *Counsel for Plaintiff*

## **VERIFICATION**

I, Hugues Gervat, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 1/21/2022 day of January, 2022.

DocuSigned by:

Hugues Gervat

2F6AF3BA1A3040E...

Hugues Gervat